**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**KAITLIN BUHRKE**, on behalf of herself and those similarly situated,

Address to be filed in notice under seal,

Plaintiff,

v.

**ASSOCIATION OF AMERICAN MEDICAL COLLEGES**,
655 K Street NW, Suite 100
Washington, DC 20001
SERVE: Corporation Service Company
1156 15th St NW, Suite 605
Washington, DC 20005

Defendant.

Case No. 1:26-cv-2907

**CLASS ACTION COMPLAINT**

Plaintiff Dr. Kaitlin Buhrke, on behalf of herself and all those similarly situated, brings this action against Defendant Association of American Medical Colleges for violations of the Sherman Antitrust Act and the Clayton Act.

Plaintiff, on behalf of herself and all others similarly situated, demands a trial by jury on all counts for which a right to trial by jury is allowed and, in support of this Complaint, alleges as follows:

## NATURE OF THE ACTION

1. "All medical school graduates must complete residency training before they can practice medicine independently."[1] Aspiring doctors apply to residency programs in their final two years of medical school. The residency application process

[1] AAMC, "Enrollment Up at U.S. Medical Schools" (Dec. 16, 2020), *available at* www.aamc.org/news/press-releases/enrollment-us-medical-schools.

is highly competitive, with many applicants applying to over 70 residency programs. Many applicants apply to residency programs in their preferred specialty and to residency programs in other specialties as a backup.

2. Some specialties require doctors to obtain additional on-the-job training in fellowships after their residencies, such as a one-year spine-surgery fellowship after a five-year orthopaedic surgery residency.

3. Residency and fellowship applicants must pay for each application they submit. More than 80% of residency or fellowship applicants must submit their applications through an online application platform run by the Association of American Medical Colleges ("AAMC") called the Electronic Residency Application Service ("ERAS"). ERAS's application fees often total thousands of dollars for each applicant and must be paid when the applicants are either in medical school earning no pay or in residencies on a relatively low salary compared to their future earnings.

4. Instead of assisting aspiring doctors by reducing the economic burden of applications, AAMC takes advantage of aspiring doctors by charging exorbitant prices for applications. AAMC—an ostensible not-for-profit organization—annually collects nearly $120 million in ERAS fees from approximately 64,000 applicants per year who have little choice in this monopolized and restrained market. This colossal sum—averaging more than $1,800 per applicant—is untethered to AAMC's actual costs or to the value AAMC provides, which competing vendors could provide for, at most, a few dollars per application.

5. AAMC illegally maintains a monopoly in the market for residency and fellowship application platforms. AAMC also recently acquired one of its only competitors—Thalamus—because that competitor threatened AAMC's dominance. AAMC now packages Thalamus's software as a kickback to medical programs that use AAMC's application system. Many programs previously paid Thalamus more than $50,000 each year for its software.

6. Thalamus's CEO publicly stated he was once one of the "louder critical skeptics of the AAMC" and that his company and AAMC previously "were two organizations that for quite a while were building competitive solutions to solve a similar challenge and we were growing in market share." AAMC now holds an equity stake in Thalamus so that Thalamus no longer poses a threat to AAMC's monopoly.

7. AAMC also has structured the ERAS platform to insulate itself from competition. The applicants who pay application fees have no choice but to use ERAS to apply to their desired residency and fellowship programs. And AAMC requires the only entities with a choice—the programs—to exclusively use AAMC's platform.

8. Without AAMC's unlawful monopolization and anticompetitive conduct, applicants would not pay such high application fees.

9. AAMC and its leadership have been wildly enriched by AAMC's unlawful conduct. In its most recent 501(c)(3) nonprofit filings covering fiscal year ("FY") 2024, AAMC reported more than $460 million in net assets. AAMC's President & Chief Executive Officer received more than $2.8 million in compensation from

AAMC and related organizations in FY 2024. And AAMC reported compensating more than fifteen other executives more than $500,000 in FY 2024.

10. AAMC has violated federal antitrust law to gouge residency and fellowship applicants attempting to follow their dreams, better their lives for themselves and their families, and make a difference for patients and their communities. Injunctive relief, treble damages, and other remedies are appropriate to rectify AAMC's wrongdoing.

## VENUE AND JURISDICTION

11. Plaintiff's federal law claims arise under Sections 2 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 2, 3) and Section 7 of the Clayton Act (15 U.S.C. § 18). Plaintiff seeks damages under Section 4 of the Clayton Act (15 U.S.C. § 15), as well as injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26).

12. This Court has subject-matter jurisdiction over Plaintiff's claims under 15 U.S.C. § 15 (because the claims arise from injuries Plaintiff suffered by reason of conduct forbidden in the antitrust laws); 28 U.S.C. § 1331 (because the claims arise under the laws of the United States); 28 U.S.C. § 1337(a) (because the claims arise under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies); and 28 U.S.C. § 1332(d) (because Plaintiff and the nationwide class are diverse from Defendant and the amount in controversy for the class exceeds $5 million).

13. This Court has personal jurisdiction over AAMC because it has its principal place of business in the District of Columbia.

14. AAMC engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States. The activities of AAMC were within the flow of interstate commerce of the United States and these activities were intended to have, and did have, a substantial effect on interstate commerce of the United States. AAMC's ERAS is sold in the flow of interstate commerce.

15. Venue is proper in this District pursuant to Section 12 of the Clayton Act, codified at 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)–(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and AAMC resides in this District.

## PARTIES

16. Plaintiff Dr. Kaitlin Buhrke is a citizen of Arizona domiciled in Arizona. She is above 18 years of age.

17. Defendant Association of American Medical Colleges is an Illinois corporation with its principal place of business in Washington, D.C. AAMC is recognized as a not-for-profit membership corporation under 26 U.S.C. § 501(c)(3).

18. AAMC's membership includes all medical schools accredited by the Liaison Committee on Medical Education, health systems, hospitals, and academic societies.

19. AAMC was created and is operated, maintained, and controlled by its members. AAMC members elect AAMC's Board of Directors, who manage or direct AAMC's business and affairs.

## FACTUAL BACKGROUND

### AAMC's Electronic Residency Application Service ("ERAS")

20. Residencies and fellowships are the two primary postgraduate training programs for medical doctors. Generally, residency is the first postgraduate training program and can last up to seven years. After residency, some doctors undergo further specialized training in fellowships, which typically last up to three years. Residencies and fellowships are run by medical programs at hospitals or other medical centers.

21. Every application cycle, approximately 50,000 people apply to residencies,[2] and approximately 14,000 people apply to fellowships.[3] An application cycle generally begins in June of the year before the postgraduate training begins. For instance, the 2026 application cycle began in June 2025 for positions beginning after applicants graduate in 2026.

22. In the 2024 application cycle, approximately 4.8 million residency applications and approximately 650,000 fellowship applications were submitted through ERAS.[4] In the 2023 application cycle, approximately 4.9 million residency

---

[2] AAMC, "2025 ERAS Residency End-of-Season Report" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/media/81236/download?attachment.
[3] AAMC, "2025 ERAS Fellowship End-of-Season Report" (last visited Aug. 3, 2026) *available at* https://www.aamc.org/media/78926/download?attachment.
[4] AAMC, "ERAS Statistics" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/data-reports/publication/eras-statistics.

applications and approximately 700,000 fellowship applications were submitted through ERAS.[5]

23. ERAS has two primary functional components. The MyERAS portal is the applicant-side software through which applicants complete and submit their residency and fellowship applications. As AAMC explains, "[t]he ERAS system's primary role is to deliver your application and supporting documents to designated programs. This is no different than placing a stamp on an envelope and requesting USPS deliver the packet to a destination."[6]

24. The Program Director's WorkStation ("PDWS") is the ERAS software used by the residency or fellowship program. PDWS includes an evaluation platform for these medical programs to review applications, along with process-management tools like interview scheduling, applicant tracking, and status updating.

25. ERAS is entirely distinct from any residency matching program, specifically the National Resident Matching Program ("NRMP"). Indeed, AAMC explains: "Registration with the ERAS system does not register you for any established match. The ERAS system is a separate entity and does not provide matching services."[7] NRMP also confirms that ERAS is not a matching program:

---

[5] *Id.*

[6] AAMC, "Fees for ERAS Residency Applications" (last visited Aug. 18, 2026), *available at* https://students-residents.aamc.org/applying-residencies-eras/fees-eras-residency-applications.

[7] AAMC, "National Resident Matching Program (NRMP)" (last visited Aug. 3, 2026), *available at* https://students-residents.aamc.org/applying-residencies-eras/publication-chapters/national-resident-matching-program-nrmp.

"ERAS is a separate organization and thus requires a separate registration by applicants."[8]

26. AAMC only charges applicants fees to use ERAS. AAMC does not charge medical programs any ERAS fees.

27. The amount of application fees paid to ERAS depends on the number of total applications an applicant submits. The fee per application increases as an applicant submits more applications.

28. AAMC charged the following ERAS application fees during the 2022 through 2024 application cycles (charged based on the number of applications per specialty):

| Cycle | First 10 applications | 11–20 | 21–30 | 31+ |
|---|---|---|---|---|
| 2022 | $99 (flat fee) | $17 each | $21 each | $26 each |
| 2023 | $99 (flat fee) | $19 each | $23 each | $27 each |
| 2024 | $99 (flat fee) | $19 each | $23 each | $27 each |

29. AAMC charged, and is charging, the following ERAS application fees during the 2025, 2026, and 2027 application cycles (charged based on the number of applications per specialty):

| Cycle | 1–30 applications | 31+ |
|---|---|---|
| 2025 | $11 each | $30 each |
| 2026 | $11 each | $30 each |
| 2027 | $11 each | $30 each |

30. AAMC's decision to charge applicants and not medical programs removed an economic incentive for medical programs to be independent

[8] NRMP, "Do I have to register for ERAS or the application service designated by the program and NRMP to participate in the Match?" (last visited Aug. 18, 2026), *available at* http://nrmp.org/help/item/do-i-have-to-register-for-eras-and-nrmp-to-participate-in-the-match/.

decisionmakers when choosing a service provider in the market for residency and fellowship application platforms.

31. AAMC uses the profits of ERAS fees to pad its bank account and then kicks back money to medical schools, many of which operate medical programs that use ERAS. For instance, from FY 2022 to FY 2023, AAMC awarded a total of 56 grants together worth over $1 million to medical schools.

32. AAMC's revenue is far higher than the costs to operate ERAS and far higher than if the market were competitive.

33. As of the filing of this Complaint, ERAS has only two primary competitors. ResidencyCAS is used by OB/GYN and emergency medicine specialties. SFMatch is used by ophthalmology, independent plastic surgery,[9] and certain fellowship programs.

34. AAMC also requires any programs that use ERAS to exclusively accept applications and associated documents through ERAS, rather than also accepting applications through one of its competitors or by any other method.

35. Each program must agree to the ERAS terms and conditions each year. Those terms and conditions require that the program agrees to:

> Receive ERAS standard documents only through the ERAS services regardless of the matching service used by your program. For applicants participating in activities to fill positions after a matching event, it is essential that the documents be incorporated into PDWS. ERAS standard documents include:

---

[9] Independent plastic surgery residency programs are different from the integrated plastic surgery programs discussed later in this Complaint. Independent programs commence after a resident has completed a general surgery residency or other qualifying residency and thus are akin to a fellowship.

- MyERAS application
- Personal Statement
- Photograph
- Medical School Transcript (MST)
- Medical School Performance Evaluation (MSPE)
- Letters of Recommendation (LoRs) (capped at four per program)
- USMLE transcript
- COMLEX-USA transcript
- ECFMG status report
- American Board of Surgery In-Training Examination (ABSITE) report (Fellowship only).[10]

**<u>AAMC's Enrichment from ERAS Fees</u>**

36. AAMC and its personnel have been enriched by supracompetitive ERAS fees.

37. In the latest four years of AAMC's publicly available tax filings, AAMC has reported an average of around $118 million in revenue from ERAS *each year*: $113,355,247 for fiscal year 2024–25; $126,105,395 for fiscal year 2023–24; $124,225,484 for fiscal year 2022–23; and $119,982,746 for fiscal year 2021–22.

38. AAMC—an ostensible not-for-profit organization—reported $460 million in total net assets at the end of FY 2024. A significant portion of those assets stem from the exorbitant ERAS fees that AAMC charges applicants.

39. AAMC spends some of the fees it collects on massive compensation packages for executives. AAMC reported the following total compensation in FY 2024:

- President and CEO: $2,849,059
- Chief Medical Education Officer: $955,469

[10] AAMC, "2027 ERAS PDWS Terms and Conditions" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/media/86446/download.

- Chief Health Care Affairs Officer: $947,304
- Executive Director, Research & Action Institute: $909,118
- Chief Services Officer: $839,652
- Chief Strategic Operations and Data Officer: $714,710
- Chief Diversity & Inclusion Officer: $720,992
- Chief Legal Officer: $701,989
- Chief Public Policy Officer: $688,247
- Chief Human Resources Officer: $551,293
- Chief of Staff: $636,747
- Chief Information Officer: $626,130
- Chief Learning Officer: $603,817
- Chief Financial and Administration Officer: $593,808
- Chief Communications and Marketing Officer: $542,947

40. AAMC also reported paying $1.9 million in FY 2024 for employees to travel.

**Thalamus: A Startup Competitor to ERAS**

41. Thalamus is a software company founded in 2013 by doctors to address inefficiencies in the residency and fellowship application process. Its initial software offerings focused on interview management. The interview management features are now called Thalamus Core. Thalamus expanded to provide other residency and

fellowship application tools, including AI-based application evaluation software known as Cortex and a data and analytics dashboard known as Cerebellum.[11]

42. Cortex provides medical programs technology-assisted holistic review of applications, which Thalamus asserts can reduce screening time by 50%.[12] Thalamus asserts that Cortex uses natural language processing, optical character recognition, and other artificial intelligence or machine learning technologies to permit advance filtering and searches of applications, provide comprehensive summaries of all applicants, and optimize review workflow.

43. From its founding until April 2023, Thalamus licensed its software directly to medical programs. As of 2022, Thalamus served more than 2,000 residency and fellowship programs across 200 hospitals.[13] Hospitals often paid Thalamus $50,000 to $75,000 thousand dollars to license Thalamus software.[14] As of March 2022, Thalamus received approximately $4–$5 million in revenue per year.[15]

44. Until April 2023, Thalamus's software directly competed with ERAS by offering software that purported to improve on many of ERAS's application management functions.

---

[11] Thalamus, "About Us" (last visited Aug. 3, 2026), *available at* https://www.thalamusgme.com/about-us.
[12] Thalamus, "Revolutionize Your Application Review with Thalamus Cortex" (last visited Aug. 3, 2026), *available at* https://www.thalamusgme.com/add-ons/cortex-application-screening.
[13] N. Latka, "Hospital SaaS for residencies grows $1m to $3.5m last 18 months", at 3:55-4:00 (March 12, 2022) (interview with Thalamus founder Dr. Jason Reminick), *available at* https://www.youtube.com/watch?v=xtBsJCEeayc.
[14] *Id.* at 1:59–2:02.
[15] *Id.* at 6:30–6:40.

45. Thalamus also aspired to further compete with AAMC. According to Thalamus's founder and CEO, Dr. Jason Reminick, Thalamus's long-term goal was to "improv[e] the recruitment process," increase diversity and equity in the recruitment process, and help hospitals and applicants make better strategic decisions.[16] This recruitment process was, and still is, largely driven by AAMC and ERAS.

46. In a 2019 Thalamus press release announcing an early-stage funding round it had achieved, Dr. Reminick described the state of residency and fellowship applications under ERAS as an opportunity for competition by his company: "The cost of training and placing doctors in residency programs in the United States is staggering for residents and those costs in time and money ultimately trickle down to affect patient care. . . . With more than $80 million spent annually on residency application costs, and billions more on travel and hospital administrative expenses, we are confident that this is a marketplace suitable for innovation with a cloud-based solution."[17] As one of the investors stated in the 2019 press release, Thalamus was "positioned to be the dominant player in an emerging market for SaaS solutions in the medical administration space."[18]

47. Now, Thalamus works with AAMC at the expense of other application platforms. In response to a FAQ on its website asking "Does Thalamus Cerebellum

[16] *Id.* at 9:31–50.
[17] Thalamus, "Thalamus Secures New Funding for Premier Medical Residency Mgmt. Platform" (Dec. 12, 2019), *available at* https://www.thalamusgme.com/blogs/thalamus-secures-new-funding-for-premier-medical-residency-management-platform.
[18] *Id.*

currently support non-ERAS programs," Thalamus states: "Currently, Thalamus Cerebellum only fully supports residency and fellowship programs that utilize the ERAS program."[19] Accordingly, programs that wish to use the full suite of Thalamus offerings must also use ERAS.

**AAMC Licenses Thalamus's Software to Provide for Free to ERAS Users and Acquires Equity Stake in Thalamus.**

48. In April 2023, AAMC and Thalamus announced a "collaboration" under which AAMC would provide Thalamus software for free to all medical programs using ERAS.[20]

49. Dr. Reminick explained the arrangement on a podcast shortly after the agreement was announced:

> [E]ssentially, we are working with our partners and collaborators at the AAMC, and we're working to build a new solution or an innovated solution to the overall process. And so our software is going to be licensed by the AAMC and provided complimentary to all residency and fellowship programs that us ERAS.[21]

50. The agreement initially only covered access to Thalamus's interview management platform and Cerebellum, the data and analytics dashboard. Medical programs that wished to use the Thalamus Cortex software to evaluate applications

[19] Thalamus, "AAMC-Thalamus Collaboration FAQs" (last visited Aug. 3, 2026), *available at* https://www.thalamusgme.com/aamc-thalamus-faqs.
[20] AAMC, "AAMC, Thalamus Announce New Collaboration to Improve Transition to Residency" (April 27, 2023), *available at* https://www.aamc.org/news/press-releases/aamc-thalamus-announce-new-collaboration-improve-transition-residency.
[21] Prospective Doctor Podcast, "Thalamus GME: A Game-Changer for Medical Education & Training", at 10:27–53 (Apr. 21, 2025), *available at* https://www.youtube.com/watch?v=mVV-T-nTYZU.

still had to pay Thalamus for Cortex. In 2024, AAMC and Thalamus announced that they would offer Cortex for free to ERAS medical programs beginning in July 2025.[22]

51. As of this Complaint, Thalamus's Cortex has been fully integrated into ERAS.[23] According to AAMC, Thalamus software has fully replaced two ERAS features: ERAS Interview Scheduler (replaced by Thalamus's interview management software) and ERAS Analytics for Institutions (replaced by Thalamus Cerebellum).[24]

52. AAMC acknowledges that it pays Thalamus to offer its software as a free benefit to programs that use ERAS. In AAMC's terms of service for programs using ERAS, AAMC states: "AAMC has already paid for access to these services and is now offering them for you to use on a complimentary basis."[25]

53. In January 2025, AAMC acquired an equity stake in Thalamus. According to a Thalamus press release, AAMC led a $30 million Series B funding round. Thalamus described AAMC's investment as a "further expansion of the organizations' groundbreaking collaboration within academic medicine, which was formally announced in April 2023."[26]

---

[22] AAMC, "AAMC and Thalamus Expand Strategic Collaboration to Offer Technology-Assisted Holistic Application Review Platform" (Nov. 7, 2024), https://www.aamc.org/news/press-releases/aamc-and-thalamus-expand-strategic-collaboration-offer-technology-assisted-holistic-application.

[23] AAMC, "AAMC-Thalamus Collaboration Information for Programs" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/services/eras-institutions/faqs-aamc-thalamus.

[24] *Id.*

[25] AAMC, "2027 ERAS PDWS Terms and Conditions" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/media/86446/download.

[26] AAMC, "Thalamus Raises $30 Million Series B to Expand Physician Workforce for Health Systems and Patients Nationwide" (Jan. 30, 2025), *available at* https://www.thalamusgme.com/blogs/thalamus-raises-30-million-series-b-to-expand-physician-workforce-for-health-systems-and-patients-nationwide.

54. Thalamus's cooperation with AAMC was a remarkable change of position for the company, which previously regarded AAMC as its competitor and an obstacle to improvements in the residency and fellowship application process. On an AAMC-hosted podcast shortly after the collaboration was announced, Dr. Reminick was asked, "[W]hat makes the collaboration and partnership so special to Thalamus?" He responded:

> Yeah, I think the surprise overall has been that the more and more we got to talking, the more overall mission alignment we saw amongst both organizations, when historically there was probably more competitive aspects and more competitive dynamics. And, yeah, I'd say I was[,] at one point, probably one of the louder critical skeptics of the AAMC and that may have been mutual in some capacities as well. [27]

55. Dr. Reminick echoed his characterization of AAMC and Thalamus as competitors-turned-collaborators in a February 2024 blog post, noting:

> I believe the GME[28] community may have been surprised by our collaboration, as two organizations that had competed for years were now working together to bring innovation to the transition to residency. I am also aware of the community's criticism of the AAMC, because I was a frequent and bold contributor to that conversation. But as we finalized the collaboration, our two organizations were able to align on making this transition better for all members of the community.[29]

---

[27] AAMC, "Transcript for Ask an Expert About . . . Transforming the Residency Application Process" (April 11, 2024), *available at* https://www.aamc.org/news/beyond-white-coat-podcast/transcript-ask-expert-about-transforming-residency-application-process

[28] "GME" stands for graduate medical education and sometimes is used as shorthand for residencies and fellowships.

[29] Thalamus, "Building trust in the transition to residency by ensuring fair competition and protecting future applicants: Why Thalamus sent an attorney's letter to APGO" (Feb. 25, 2024), *available at*

Notably, the "community" to which Dr. Reminick addressed his letter was "the medical education community," which is the medical programs—*not the applicants*. The medical programs benefit from the AAMC and Thalamus "collaboration" because the programs now get services from both companies for free. The applicants—the Plaintiff and Class Members in this case—are the ones footing the bill.

56. Dr. Reminick explained that negotiations between the two competitors "building competitive solutions to solve a similar challenge" had been going on for years before the collaboration was announced. In a 2025 interview he stated:

> We were two organizations that for quite a while were building competitive solutions to solve a similar challenge and we were growing in market share. Their solutions were also growing in market share, and after several years of discussions we came together and AAMC came to us and said we see a real path forward here for our organizations to work together.[30]

57. A commentator's contemporaneous 2023 blog post shared Dr. Reminick's view of Thalamus and AAMC as direct competitors, describing: "Not long ago, Thalamus was the disruptive innovator that seemed best poised to challenge ERAS."[31]

---

https://www.thalamusgme.com/blogs/building-trust-in-the-transition-to-residency-by-ensuring-fair-competition-and-protecting-future-applicants-why-thalamus-sent-an-attorneys-letter-to-apgo#.

[30] PracticeLink, Building Thalamus, Equity, and the Future of GME | Workforce Wisdom Ep. 24 with Jason Reminick, at 22:04–40 (Sept. 5, 2025), *available at* https://www.youtube.com/watch?v=UCXfl2uQRsc.

[31] Bryan Carmody, "The OB-GYN/ERAS Divorce: Winners & Losers Edition" (July 28, 2023), *available at* https://thesheriffofsodium.com/2023/07/28/the-ob-gyn-eras-divorce-winners-losers-edition/.

58. Through AAMC's agreements with and partial equity acquisition of Thalamus, AAMC eliminated Thalamus as both an actual and potential competitor of ERAS.

59. As Dr. Reminick stated, AAMC and Thalamus began discussions of a "collaboration" years before they announced their first agreement in April 2023. Thalamus thus ceased to compete or prepare to compete with AAMC years before April 2023. The exact timing of AAMC's and Thalamus's discussions may be determined through discovery.

**AAMC's Use of Thalamus to Prevent Defections**

60. In recent years, two medical specialty groups launched competing application systems to ERAS. The American Council of Educators in Plastic Surgery launched the "Plastic Surgery Common Application." The American College of Obstetricians and Gynecologists launched their own system called "ResidencyCAS." ResidencyCAS has also been adopted by emergency medicine specialties. Both application services were developed by third-party vendors.

61. The Plastic Surgery Common Application was launched in 2022.[32] When it was first launched, it was free for applicants. It later imposed a flat fee of $100 to apply to any number of the 90 integrated plastic surgery programs across the country.[33] The vendor that developed the Plastic Surgery Common Application

[32] The Plastic Surgery Specialty Group created the "Plastic Surgery Common Application."

[33] Taylor G. Hallman and Arun K. Gosain, "Discussion: The Plastic Surgery Central Application vs. ERAS: Which is Preferred?" (July 24, 2024), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC11268807/.

reports that it reduced costs to applicants by 95%.[34] A survey published in 2024 showed that 72% of responding medical program directors and 59% of responding applicants preferred the Plastic Surgery Common Application to ERAS, and only 18% of medical program directors and 27% of applicants preferred ERAS. More than 90% of responding applicants also stated that the cost savings of the Plastic Surgery Common Application as compared to ERAS was important, with 63% describing the savings as "very important." Nonetheless, in 2025—the same year that AAMC made Thalamus Cortex available to programs using ERAS—the American Council of Educators in Plastic Surgery discontinued the Plastic Surgery Common Application and recommended integrated plastic surgery programs use ERAS.[35] The American Council of Educators in Plastic Surgery explained, in response to the frequently asked question, "Can you please explain why the ERAS application is being used again?" that "integration with holistic review tools and scheduling software such as Thalamus has prompted a move back to the platform."[36]

62. ResidencyCAS was announced in 2023 for the 2024–2025 application cycle. It imposes a graduated scale that increases fees based on the number of applications: a $99 flat fee for applications 1–18, $18 per application for applications

---

[34] CentralApp (last visited Aug. 3, 2026) *available at* https://web.archive.org/web/20251009135527/https://www.accessgme.info/.

[35] American Council of Educators in Plastic Surgery, "Applying to Plastic Surgery" (last visited Aug. 3, 2026), *available at* https://aceplasticsurgeons.org/apply-plastic-surgery/.

[36] ACEPS, "Match Process FAQs" (last visited Aug. 3, 2026), *available at* https://aceplasticsurgeons.org/Resources/match-faq.cgi.

19–30, and $23 per application for applications 31+.[37] Once an applicant submits 10 applications, the applicant will pay less per application through ResidencyCAS than if the applicant applied through ERAS.[38] Overall, ResidencyCAS fees are approximately 20% less than ERAS fees.[39] As of this filing, OB/GYN and emergency medicine specialties still use ResidencyCAS.[40]

63. Based on available data from the 2024 application cycle—the last cycle that both OB/GYN and emergency medicine programs participated in ERAS—OB/GYN and emergency medicine applicants comprise less than 15% of the total residency applicant population,[41] less than 5% of the total fellowship application population, and approximately 12.5% of the overall application population for both residencies and fellowships.[42]

---

[37] ResidencyCAS, "ResidencyCAS Application Fees" (last visited Aug. 3, 2026), *available at* https://help.liaisonedu.com/ResidencyCAS_Applicant_Help_Center/Starting_Your_ResidencyCAS_Application/Getting_Started_with_Your_ResidencyCAS_Application/03_Application_Fees.

[38] The price difference between ERAS and ResidencyCAS varies depending on the number of applications submitted. For example, an applicant applying to 18 programs will pay $99 to ResidencyCAS but $198 to ERAS (approximately 50% less). But an applicant applying to 60 programs will pay $1,005 to ResidencyCAS and $1,230 to ERAS (approximately 19% less).

[39] Am. Med. Ass'n, "How emergency medicine's new application could affect your Match" (Aug. 20, 2025) ("ResidencyCAS uses a tiered pricing model similar to the widely used Electronic Residency Application Service, but its fees are about 20% lower overall."), *available at* https://www.ama-assn.org/medical-students/preparing-residency/how-emergency-medicine-s-new-application-could-affect-your.

[40] ResidencyCAS (last visited Aug. 14, 2026), *available at* https://residencycas.com/.

[41] AAMC, "2021-2026 Residency Applicant/Application Volume" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/media/86181/download?attachment.

[42] AAMC, "2021-2026 Fellowship Applicant/Application Volume" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/media/86186/download?attachment.

64. AAMC has considered the Plastic Surgery Common Application and ResidencyCAS as competitive threats to ERAS. In June 2023, AAMC issued a press release expressing its "surprise[] and dismay[]" about the new platforms.[43] The release also highlighted "significant advancements" to ERAS "including support of holistic review and integration with Thalamus."

65. When AAMC's press release did not work, it pressured its member medical schools—many of which have received kickback payments from AAMC—to take action. In 2024, AAMC's Chief Academic Officer, Dr. Alison Whelan, emailed members of the AAMC Council of Deans (deans of AAMC's medical school members). She alerted the Deans that "two new specialty-driven residency application services (Plastic Surgery and OB/GYN) have emerged as possible alternatives to the Electronic Residency Application Service® (ERAS®) program. We believe this introduces additional fragmentation and confusion to the already complicated process."[44] She asked the deans to speak with their hospital and specialty leadership to "underscore the critical need to work collaboratively through a unified residency application system with the AAMC."

---

[43] AAMC, "AAMC Response to New Residency Application Platform for Obstetrics & Gynecology" (July 28, 2023), *available at* https://www.aamc.org/news/press-releases/aamc-response-new-residency-application-platform-obstetrics-and-gynecology

[44] R. Robertson, "Leaked AAMC Emails Reveal Concern About ERAS Exodus" (March 7, 2024), *available at* https://www.medpagetoday.com/special-reports/exclusives/109067.

## Comparative Competitive Markets for Application Services

66. The prices charged for comparable central application platforms in other sectors underscore how AAMC has used its monopoly power to vastly inflate its prices and revenue.

### *Competing Medical Residency and Fellowship Application Systems*

67. As noted above, at least two competing medical residency and fellowship application services were developed and launched since 2023: the Plastic Surgery Common Application and ResidencyCAS. Only ResidencyCAS remains operational.

68. The Plastic Surgery Common Application charged applicants a $99 flat fee for applications up to 90 programs—potentially as cheap as $1 per program. Integrated plastic surgery applicants applied to 57.22 programs on average in 2022 and 51.77 on average in 2023 using ERAS, which would equate to approximately $2 per application using the Plastic Surgery Common Application.[45]

69. ResidencyCAS can cost applicants 10% to 50% less per application than ERAS, depending on how many applications are submitted, but typically costs 20% less than ERAS applications.[46]

---

[45] AAMC, "2021–2026 Residency Applicant/Application Volume" (last visited Aug. 3, 2026), *available at* https://www.aamc.org/data-reports/publication/eras-statistics.
[46] *See supra* ¶ 62. Because ResidencyCAS charges a flat fee for the first 18 applications, submitting 8 or fewer applications is cheaper through ERAS. At every other point, ERAS is more expensive.

***Higher Education Centralized Application Services***

70. Relatedly, the centralized application service for undergraduate admissions, Common Application, processes millions of applications for hundreds of programs at a fraction of the cost that AAMC charges applicants for ERAS.

71. Common Application applicants can apply directly through the Common Application's website. The Common Application offers many of the same features as ERAS, including soliciting and accepting letters of recommendation, compiling and reporting demographic information and GPA, and other general processing features. Like ERAS, it also offers a backend platform for the institutions to review applications.

72. Unlike AAMC, the Common Application does not charge applicants any fees for its application platform. Instead, the Common Application charges member schools a flat fee of $2,500 per year, a per-application fee of $3.76–$4.80 (depending on the platform a school uses), and a $2.00 payment processing fee if a school requires an applicant to pay an application fee.[47] Individual schools determine the fee that they will charge applicants, or whether to charge any fee. More than 500 Common Application schools charge no application fee.[48] Thus, an applicant applying to one of these schools would incur no application costs. Those Common Application schools have made competitive decisions not to pass application costs to applicants, presumably with the goal of increasing applications.

---

[47] The Common Application also charges a one-time implementation fee for new member schools.

[48] *See* Common App, "Explore Colleges" (last visited Aug. 3, 2026) *available at* commonapp.org/explore.

73. Such competition and such benefits to applicants are not possible in the monopolistic market established by AAMC with ERAS. Applicants must bear the costs of ERAS regardless of the medical program to which they apply. The example of Common Application illustrates that AAMC's fees charged to residency and fellowship applicants dwarf what a centralized application service could charge in a competitive market.

74. The price disparities between application fees for residency and fellowship applications and undergraduate admissions underscores AAMC's inflation of its fees. And the Common Application and similar competitive centralized application systems underscore that a centralized system does not require monopolized, supracompetitive fees. AAMC could offer a centralized application platform that encourages competition. It has chosen instead to restrict and prevent competition at applicants' expense.

## RELEVANT MARKET

75. AAMC's conduct is unlawful in the market for a centralized platform to handle applications to medical residencies and fellowships ("Postgraduate Medical Training Application Platform Market").

76. The Postgraduate Medical Training Application Platform Market includes centralized application platforms for medical residencies and fellowships at medical programs located in the United States, including its territories and the District of Columbia. This market includes platforms that currently handle applications for medical residencies and fellowships and platforms that could

promptly develop widespread use among medical residencies and fellowship programs to provide network effects that would support adoption of such platforms.

77. As of this Complaint, three primary platforms compete in the Postgraduate Medical Training Application Platform Market: ERAS, ResidencyCAS, and SFMatch—a significantly smaller application platform for ophthalmology residencies and several fellowships.

78. Based on available data from the 2024 application cycle, approximately 77,000 applicants paid fees to, and thus purchased the services of, Postgraduate Medical Training Application Platforms. Approximately 65,000 applicants used ERAS (more than 80% of applicants). Approximately 8,000 people applied to specialties that required ResidencyCAS and thus used ResidencyCAS (approximately 10% of applicants).[49] And approximately 4,500 used SFMatch (approximately 6% of applicants). Applicants do not have a choice of which platform they use because the programs to which they apply determine the platform accepted.

79. ERAS also has a substantial market share measured by the number of specialties using a given application platform. For instance, for the 2026 residency

[49] Applicant count data is not publicly available for ResidencyCAS, so these numbers are extrapolated from ERAS data for the 2024 cycle when the specialties now using ResidencyCAS used ERAS.

cycle, approximately 4,800 residency programs used ERAS.[50] This represented approximately 70% of all residency programs for the 2026 residency cycle.[51]

80. One knowledgeable commentator on ERAS has recognized AAMC has monopoly power by explaining, "You've got to remember, the AAMC could've set up any fee structure that they wanted for ERAS."[52]

81. The Postgraduate Medical Training Application Platform Market includes platforms that process both residency and fellowship applications because there are no material differences between the applications from a processing perspective, as evidenced by the fact that ERAS processes both residency and fellowship applications.

82. The geographic scope of the Postgraduate Medical Training Application Platform Market does not extend to applications for postgraduate medical training in countries outside the United States because most, if not all, prospective applicants considering applying to residency and fellowship programs consider U.S. residency and fellowship programs distinct because of their desire to live and practice medicine in the United States.

---

[50] AAMC, "A Strong Start to the 2026 Residency Cycle & a New Era of Data Transparency" (Sept. 30, 2025), *available at* https://www.aamc.org/services/eras-institutions/eras-insights/strong-start-2026-september-residency-cycle-and-new-era-data-transparency.

[51] PR Newswire, "NRMP Releases Results of the 2026 Main Residency Match for More than 38,000 Future Residents" (Mar. 20, 2026), *available at* https://www.prnewswire.com/news-releases/nrmp-releases-results-of-the-2026-main-residency-match-for-more-than-38-000-future-residents-302719870.html.

[52] B. Carmody, M.D., "ERAS and Financial Conflict of Interest at the AAMC" at 31:18 (Jan. 19, 2024), *available at* https://www.youtube.com/watch?v=PRR7PaoF1lY.

83. The Postgraduate Medical Training Application Platform Market does not include platforms for applications for postgraduate medical training for non-medical-school graduates, such as nursing or administrative roles, because those application platforms do not allow applicants to practice as medical doctors. The residency and fellowship programs applicable to the Postgraduate Medical Training Application Platform Market also are not available to applicants who have not graduated from an educational program that would qualify an applicant to apply for such programs.

84. The Postgraduate Medical Training Application Platform Market also does not include platforms for non-medical positions because the residency and fellowship programs that select the applications require the platforms be tailored to the needs of residency and fellowship programs. By way of example, before the American College of Obstetricians and Gynecologists launched ResidencyCAS, it engaged in feedback with OB/GYN programs to determine what features they need and desire. Features specific to the postgraduate medical training application platforms can include interview management and program signaling (a tool for an applicant to indicate serious interest in a program).

85. Accordingly, although competitors can create and have created competing application platforms, off-the-shelf platforms are not interchangeable with the ERAS platform or other postgraduate medical training application platforms because they do not have the network effects necessary to enter the market.

86. Indeed, centralized platforms require network effects to make the platform worthwhile to join. Accordingly, programs would not switch to a different platform unless it had a sufficient number of programs already on the platform or was capable of imminently garnering a sufficient number of programs.

87. Centralized platforms in the Postgraduate Medical Training Application Platform Market exhibit cross-elasticity of demand. For instance, AAMC changed the pricing structure for ERAS after ResidencyCAS was launched in order to address defections. This underscores that in the face of a reduction of price for one centralized platform in the Postgraduate Medical Training Application Platform Market, demand decreases for a platform for which the price stays the same. Similarly, an increase in price for one centralized platform in the Postgraduate Medical Training Application Platform Market would reduce demand for that platform and increase demand for any platforms that did not have price increased.

88. AAMC also regards other centralized platforms in the Postgraduate Medical Training Application Platform Market as interchangeable competitors. When programs left ERAS for ResidencyCAS, AAMC responded with a press release expressing its "surprise[] and dismay" and highlighting the "significant advancements" to ERAS "including support of holistic review and integration with Thalamus."

**HARM TO THE MARKET AS A WHOLE**

89. One way to view the Postgraduate Medical Training Application Platform Market may be as a two-sided market. To the extent the market is a two-

sided market, which Plaintiff does not concede in this Complaint, AAMC's conduct has restrained this two-sided market as a whole.

90. The supracompetitive fees charged to applicants are higher than the value of the platform as a whole. This is evidenced by AAMC's approximate $120 million in annual revenue, which is significantly higher than charged by comparable platforms, than the costs and value of the ERAS platform, and than could be charged in a competitive market.

91. AAMC's conduct also has caused harm to each side of the restrained two-sided market.

92. On the applicant side, applicants pay supracompetitive prices. The supracompetitive nature of the prices, and AAMC's supracompetitive revenue, far exceed the value provided to programs on the other side of the market. Accordingly, AAMC has caused harm to the market as a whole.

93. On the program side, AAMC restricted, and in some cases eliminated, competition for programs to choose centralized application platforms through its anticompetitive conduct. AAMC eliminated Thalamus, an actual and nascent competitor, and thus has reduced competition for programs to select competing platforms. AAMC also requires programs to exclusively use AAMC's platform and has built other barriers to entry through its kickbacks of its monopoly profits, including its free provision of Thalamus to programs.

94. For instance, as evidence of the harm to competition on the program side, plastic surgery programs that transitioned to a centralized platform that

charged applicants a $99 flat fee for all applications transitioned back to AAMC's supracompetitive ERAS platform once AAMC offered Thalamus's software as a free kickback to the plastic surgery programs.

## CLASS REPRESENTATIVE ALLEGATIONS

95. Plaintiff submitted 81 applications through ERAS. She paid AAMC $1,691 for those applications. Plaintiff paid AAMC those fees within four years before the filing of this Complaint.

96. Plaintiff paid the ERAS fees directly to AAMC for application to orthopaedic surgery, surgery, and urology residency programs in the United States.

97. Plaintiff was not permitted to apply by other means to the programs to which she applied.

98. AAMC's unlawful conduct allowed AAMC to overcharge Plaintiff for her ERAS fees.

99. Plaintiff intends to use ERAS again to apply to additional programs that require applications submitted through ERAS. Plaintiff thus expects to pay supracompetitive ERAS fees absent an order from this Court prohibiting AAMC's unlawful conduct.

## CLASS ACTION ALLEGATIONS

100. Plaintiff brings claims, *infra*, on behalf of similarly situated persons against Defendant under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) and seeks certification of class defined as follows: All individuals who paid ERAS fees to AAMC to apply to a residency or fellowship program in the United States, including its territories and the District of Columbia.

101. The class period begins four years before the filing of this lawsuit.

102. Plaintiff reserves the right to amend these definitions as discovery proceeds and to conform to the evidence.

103. Excluded from the Class are Defendant, its agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

104. While the exact number of the Nationwide Class is unknown at this time, Plaintiff submits that AAMC's publicly available data shows that at least 50,000 applicants have applied to residency and fellowship programs each application cycle since 2022.

105. Because the number of potential Class Members is so numerous, individual joinder of these members is impracticable.

106. Plaintiff further alleges the Class Members will be ascertainable through discovery, including, but not limited to, Defendant's electronic records and databases, third-party discovery, and discovery concerning the identity of people who paid AAMC's fees for ERAS.

107. There are common questions of law and/or fact shared by Plaintiff and each Class Member. The common questions of law and/or fact include, but are not limited to, the following:

a. whether AAMC possesses monopoly power in a relevant market;

b. whether AAMC willfully acquired or maintained monopoly power;

c. whether AAMC's conduct has had an anticompetitive effect on a relevant market;

d. whether AAMC's collaboration with Thalamus unreasonably restrained trade;

e. whether AAMC's acquisition of and collaboration with Thalamus posed a reasonably likelihood of substantially lessened competition or tended to create a monopoly;

f. whether AAMC's conduct injured consumers; and

g. the appropriate nature of class-wide injunctive or other equitable relief.

108. Certification of the Class under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) is appropriate as to the members of the putative class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. All Class Members were subject to the same conduct by AAMC because such conduct was AAMC's standard business practice applied consistently for applications through ERAS to residency or fellowship programs.

109. A class action will cause an orderly and expeditious administration of claims by the members of the Class, will foster economies of time, effort, and expenses, and will ensure uniformity of decisions.

110. Plaintiff's claims are typical of the claims of the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) since they are based on and arise out of identical facts constituting the wrongful conduct of AAMC.

111. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of other Class Members, and she will fairly and adequately protect their interests. Additionally, Plaintiff is cognizant of her responsibility as a class representative, and she has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action. Plaintiff's counsel has extensive experience in class action litigation.

112. The Class Members have suffered the same or similar injury as the Plaintiff, including actual damages.

**COUNT I**
**MONOPOLIZATION**
**VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT,**
**15 U.S.C. § 2**

113. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–112 as if fully set forth herein.

114. This claim is brought against AAMC by Plaintiff individually and on behalf of the Class.

115. AAMC has willfully acquired and maintained a monopoly over the Postgraduate Medical Training Application Platform Market. No other significant competitors exist in this market or can feasibly exist because of AAMC's willful maintenance of its monopoly through anticompetitive practices. The anticompetitive practices include: (1) AAMC's requirement that programs exclusively use ERAS;

(2) AAMC's collaboration with, and then equity acquisition of, the competitor Thalamus; (3) AAMC's use of Thalamus as a kickback to entice medical specialties and medical programs to use ERAS; and (4) AAMC's structuring of ERAS to insulate it from competition and kickback money to medical schools affiliated with residency programs.

**<u>Monopoly Power</u>**

116. Both direct and indirect evidence of AAMC's market power exist.

117. Direct evidence of AAMC's monopoly power includes its unchecked power to increase the amount of the fees it charges applicants: "the AAMC could've set up any fee structure that they wanted for ERAS."[53]

118. Indirect evidence of AAMC's monopoly power also exists. AAMC has acquired and maintained a market share exceeding 80% when measured by the total number of applicants and by 70% when measured by the total number of programs. AAMC thus also would be expected to have a similar and substantial market share as measured by the total number of applications processed. AAMC's market share forecloses that substantial share of the market from the many potential competitors that offer services that could compete.

119. Barriers to entry exist for potential competitors. These barriers to entry include the network effects necessary for a centralized application platform, the

[53] B. Carmody, M.D., "ERAS and Financial Conflict of Interest at the AAMC" at 31:18 (Jan. 19, 2024), *available at* https://www.youtube.com/watch?v=PRR7PaoF1lY.

several years of planning required to shift a program from one application platform to another, and the anticompetitive practices by AAMC.

**<u>Anticompetitive Practices</u>**

***Exclusivity Requirements***

120. *First,* AAMC excludes competition by explicitly requiring any programs that use ERAS to exclusively accept applications through ERAS.

121. Accordingly, AAMC prohibits programs that use ERAS from accepting applications from any competing application platform.

122. Because of the additional anticompetitive practices discussed below, this express exclusivity also is *de facto* long-term exclusivity. For instance, AAMC's offering of Thalamus as a valuable kickback to programs induces long-term loyalty so that the vast majority of programs stay with ERAS year after year.

***Elimination of Competition from Thalamus***

123. *Second*, AAMC entered into cooperative discussions with, collaborated with, and has since acquired an equity share of, its competitor Thalamus. As part of the agreement between AAMC and Thalamus, AAMC licenses Thalamus's software to include as a free benefit for all medical programs that use AAMC's ERAS.

124. Thalamus was an actual competitor to the medical-program facing aspects of AAMC's ERAS. Indeed, Thalamus's CEO Jason Reminick regarded AAMC and Thalamus as competitors. Thalamus offered software that could supplement or replace ERAS features, including application review and analysis, interview scheduling and management, and analytics.

125. The Thalamus software has been rolled into AAMC's ERAS and has even entirely replaced certain features of ERAS.

126. Thalamus also was at least a nascent competitor for other aspects of ERAS, including the applicant-facing side of ERAS. Thalamus viewed itself as a disruptor of the entire application process and aimed to lower overall costs for applicants—necessarily requiring competition with AAMC and ERAS. Indeed, Dr. Reminick considered himself to be one of AAMC's strongest critics before Thalamus joined forces with AAMC. Moreover, one of Thalamus's own investors predicted that Thalamus could become a "dominant player," and a commentator regarded Thalamus as the company "best poised to challenge ERAS." If Thalamus was not actively competing with AAMC on certain aspects of ERAS, sufficient contemporary statements confirm that it intended to compete and could have competed.

127. Given Thalamus's significant customer base among medical programs, experience with and knowledge of the residency and fellowship application process, and developed technology related to that same process, Thalamus could have directly competed with all of ERAS by developing a full application platform.

128. Since AAMC and Thalamus's collaboration first began to be negotiated years before 2023, Thalamus stopped competing with AAMC and instead has worked cooperatively with AAMC.

129. AAMC was able to collaborate with and acquire a stake in Thalamus because of its monopoly power. AAMC used the revenue from its supracompetitive

prices to enter into a licensing arrangement that supplanted Thalamus's previous revenue from its medical program customers.

***Provision of Thalamus to Entrench Monopoly Power***

130. *Third*, AAMC has used Thalamus to entrench its monopoly power. AAMC has offered Thalamus's valuable software for free to medical programs that use ERAS. Many of the programs previously paid Thalamus $50,000 or more annually for Thalamus's software. Other competitors cannot offer this free software, in large part because they do not enjoy the revenue from AAMC's supracompetitive prices.

131. Indeed, the very year that AAMC began to offer Thalamus's application review software Cortex to medical programs for free, the American Council of Educators in Plastic Surgery shut down the Plastic Surgery Common application and recommended that integrated plastic surgery programs use ERAS.

***Structuring Platform to Prevent Competition***

132. *Fourth*, AAMC also has constructed illegitimate and nearly insurmountable barriers to entry for competitors by structuring ERAS as a restrained market such that competitors have significant barriers to access potential customers on either side of the platform. These barriers include using the revenue from ERAS fees to provide its service in the Postgraduate Medical Training Application Platform Market for free to medical programs and paying kickbacks to medical schools that also control medical programs using ERAS.

133. Applicants have no choice but to use the application platform chosen by the program to which they are applying. Indeed, as explained above, AAMC explicitly

requires medical programs not to accept application materials through other application platforms. Potential competitors thus have no feasible way to win business from applicants.

134. As a result, because of AAMC's structuring of the platform in this manner, AAMC can maintain its monopoly power because the market participants who must bear the supracompetitive pricing, and thus who would be most sensitive to pricing and typically would have economic incentives to switch to interchangeable platforms, have no ability to do so because they are forced to use AAMC's platform to apply to programs.

135. Potential competitors also face significant barriers to sell alternative application platforms to medical programs in Postgraduate Medical Training Application Platform Market. Few, if any, competitors could feasibly, or legally, provide a competing platform to medical programs at no cost and while providing kickbacks to medical programs using supracompetitive fees extracted from applicants, as AAMC does.

136. The lack of significant and feasible competition has enabled AAMC to charge fees for ERAS that are far above those that could be charged in a competitive market. AAMC has exploited its monopoly power to charge supracompetitive fees.

***Other Barriers to Entry***

137. In addition to the barriers to entry imposed by AAMC's conduct, other barriers to entry exist in the Postgraduate Medical Training Application Platform Market, including costs and difficulties associated with switching platforms. To switch platforms, specialties would need to plan at least one cycle in advance and

evaluate platforms for feature compatibility. Programs also often run pilot programs to test new platforms. These costs and difficulties associated with adopting new platforms incentivize maintaining the ERAS status quo.

138. There are no procompetitive benefits of AAMC's monopolization scheme, nor was there a legitimate or sufficient business justification. Any ostensible benefits or justifications do not offset the harm caused by AAMC's anticompetitive and unlawful conduct.

139. AAMC's monopolization scheme directly and proximately caused Plaintiff and Class Members to be overcharged for ERAS as compared to what they would be charged in a competitive market.

140. Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that she and the Class Members personally suffered, most notably the supracompetitive ERAS fees that she and Class Members paid to AAMC, which would have been lower or nonexistent absent AAMC's unlawful conduct.

## COUNT II
## UNREASONABLE RESTRAINT OF TRADE
## VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

141. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–112 as if fully set forth herein.

142. This claim is brought against AAMC by Plaintiff individually and on behalf of the Class.

143. AAMC entered into an agreement with Thalamus, a horizontal competitor with AAMC's ERAS platform. Thalamus's CEO Jason Reminick has repeatedly asserted that AAMC and Thalamus regarded each other as direct competitors.

144. AAMC and Thalamus agreed to stop competing for market share and instead agreed to a collaboration. AAMC now pays Thalamus so that it can provide Thalamus products for free to programs that use AAMC. The agreement was publicly announced in April 2023 and was negotiated for years before April 2023.

145. AAMC and Thalamus have reaffirmed their agreement each year when they agree that Thalamus will not compete with AAMC in a given application cycle in exchange for payments from AAMC to Thalamus.

146. AAMC can make these payments because of the supracompetitive prices it extracts from applicants, which result from AAMC's unreasonable restraints on competition.

147. As a result of the collaboration agreement, Thalamus no longer competes with AAMC.

148. AAMC's agreement with Thalamus unreasonably restrains trade by eliminating Thalamus's competition with AAMC.

149. The agreement eliminated actual and nascent competition from Thalamus, cemented AAMC's monopoly power, and allows AAMC to charge supracompetitive prices to applicants.

150. The restraint of trade is an unlawful restraint in the Postgraduate Medical Training Application Platform Market under at least the rule of reason. Plaintiff reserves the right to assert that the restraint is unlawful under other methods of analysis if shown by discovery.

151. No procompetitive benefit could outweigh the harms to competition by eliminating Thalamus's actual or nascent competition through payments by AAMC to Thalamus.

152. The competitive harms have resulted in applicants paying supracompetitive fees to AAMC and the exclusion of actual or potential competitors.

**COUNT III**
**VIOLATION OF SECTION 7 OF THE CLAYTON ACT,**
**15 U.S.C. § 18**

153. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–112 as if fully set forth herein.

154. This claim is brought against AAMC by Plaintiff individually and on behalf of the Class.

155. AAMC has willfully acquired and maintained a monopoly over the Postgraduate Medical Training Application Platform Market. It has acquired and maintained a market share exceeding 80% when measured by the total number of applicants and by 70% when measured by the total number of programs. AAMC thus also would be expected to have a similarly substantial market share as measured by the total number of applications processed.

156. AAMC entered into a joint venture with its competitor Thalamus, later acquired an equity share in Thalamus, and has acquired the benefit of Thalamus's

software assets through AAMC's collaboration with Thalamus. As part of this collaboration, AAMC licenses Thalamus's software to include as a free benefit for all medical programs that use AAMC's ERAS.

157. Thalamus was an actual competitor in the Postgraduate Medical Training Application Platform Market to the medical-program facing aspects of AAMC's ERAS. Indeed, Thalamus's CEO Jason Reminick regarded AAMC and Thalamus as previous competitors. Thalamus offered software that could supplement or replace ERAS features, including application review and analysis, interview scheduling and management, and analytics.

158. The Thalamus software has been rolled into AAMC's ERAS and has even entirely replaced certain features of ERAS.

159. Thalamus also was at least a nascent competitor in the Postgraduate Medical Training Application Platform Market for other aspects of ERAS, including the applicant-facing side of ERAS. Thalamus viewed itself as a disruptor of the entire application process and aimed to lower overall costs for applicants—necessarily requiring competition with AAMC and ERAS. Indeed, Dr. Reminick was once of AAMC's strongest critics before Thalamus joined forces with them. Moreover, one of Thalamus's own investors predicted that Thalamus could become a "dominant player," and a contemporary commentator regarded Thalamus as the company "best poised to challenge ERAS." If Thalamus was not actively competing with AAMC on certain aspects of ERAS, sufficient contemporary statements confirm that it intended to compete or at the very least could have competed.

160. Given Thalamus's significant customer base among medical programs, experience with and knowledge of the residency and fellowship application process, and developed technology related to that same process, Thalamus could have directly competed with all of ERAS by developing a full application platform.

161. Since years before 2023, Thalamus stopped competing with AAMC and instead has worked cooperatively with AAMC. The collaboration and subsequent equity acquisition thus have lessened competition, and there remains a substantial risk that they will continue to lessen competition if not remedied.

162. AAMC was able to collaborate with and acquire Thalamus in part because of the profits from its monopoly power. AAMC used the revenue from its supracompetitive prices to enter into a licensing arrangement that supplanted Thalamus's previous revenue from its medical program customers.

163. AAMC planned to use and has used Thalamus to entrench its monopoly power. AAMC has offered Thalamus's valuable software to medical programs who use ERAS for free. Many of the programs previously paid Thalamus $50,000 or more annually for Thalamus's software. Other competitors cannot offer this free software, in part because they do not enjoy the revenue from AAMC's supracompetitive prices. Indeed, the very year that AAMC began to offer Thalamus's application review software Cortex to medical programs for free, the American Council of Educators in Plastic Surgery shut down the Plastic Surgery Common application and recommended that integrated plastic surgery programs use ERAS.

164. Section 7 of the Clayton Act prohibits acquisitions and joint ventures where the effect may be substantially to lessen competition or to tend to create a monopoly. AAMC's collaboration with and subsequent partial equity acquisition of Thalamus eliminated Thalamus's actual competition with AAMC and removed Thalamus as a potential competitor to AAMC. AAMC has used its acquisitions to maintain its monopoly power by eliminating competition and offering Thalamus software as a kickback to medical programs.

165. Plaintiff's and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendant's conduct unlawful. Plaintiff is suing, on behalf of Class Members, to recover for injuries that she and the Class Members personally suffered, most notably the supracompetitive ERAS fees that she and Class Members paid to AAMC, which would have been lower or nonexistent absent AAMC's unlawful conduct.

## **PRAYER FOR RELIEF**

Plaintiff and the Class Members seek the following relief:

a. Certify the Class;

b. Enter a judgment awarding Plaintiff and the Class Members their damages, including treble damages, for the injuries they suffered as a result of AAMC's unlawful conduct;

c. Award to Plaintiff and Class Members their costs of suit, including reasonable attorneys' fees and expenses, pursuant to, e.g., 15 U.S.C. § 15(a);

d. Order that AAMC and its directors, officers, parents, employees, agents, successors, members be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

e. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

Dated: August 18, 2026

Respectfully submitted,

/s/ *William Burgess*
William Burgess
(D.C. Bar. No. 219034)
**HILGERS PLLC**
3100 Interstate N. Circle SE
Suite 200 #1047
Atlanta, GA 30339
Telephone: 404-595-7747
Email: wburgess@hilgerslaw.com

Bennett Rawicki
(Pro Hac Vice Forthcoming)
8750 N. Central Expy., Suite 750
Dallas, TX 75231
Telephone: 469-640-6842
Email: brawicki@hilgerslaw.com

Susan A. O'Brien
(Pro Hac Vice Forthcoming)
332 S. Michigan Ave.
Suite 121 # 5612
Chicago, IL 60604
Telephone: 201-649-7207
Email: sobrien@hilgerslaw.com

*Counsel for Plaintiff and the Proposed Class*